**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRANKLIN ODINMA,<br>Plaintiff,<br>v.<br>CAPTAIN G. LUNT, ET AL.,<br>Defendants. | No. 5:26-cv-02689-MRA-AJR<br>**ORDER DISMISSING COMPLAINT WITH LEAVE TO AMEND** |

## I.

## INTRODUCTION

On May 18, 2026, *pro se* Plaintiff Franklin Odinma ("Plaintiff") filed a Civil Rights Complaint Pursuant to 42 U.S.C. § 1983 (the "Complaint") together with a Request for Proceed *In Forma Pauperis*. (Dkts. 1, 2.) Plaintiff named Oak Glen Conservation Camp's California Fire Captain G. Lunt, California Fire Captain M. Nunez, Correctional Sergeant J. Lanthripp, Correctional Officer A. Hernandez, Correctional Officer E. Golden, Correctional Officer C. Ulloa, Correctional Officer E. Haught, and Correctional Lieutenant B. Sloat, all sued in their individual and official capacities (collectively "Defendants"). (Dkt. 1 at 4-6.) For the reasons set

forth below, the Court concludes that the Complaint must be DISMISSED WITH LEAVE TO AMEND.

## II.

## PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT

In the Complaint, Plaintiff alleges that on August 25, 2024, he was working as an inmate firefighter on Crew #2 on Oak Glen Fire Camp #35 on the Park fire emergency around Chico, California, when he was seriously injured by an inmate firefighter who was allegedly under the influence of illegal drugs. (Dkt. 1 at 10.) Plaintiff alleges that the inmate firefighter cut down a tree while the fire crew was having their lunch break in a safe designated area, and Plaintiff alleges that he was directly hit by the tree and sustained injuries in his left shoulder, neck, and back areas. (Id. at 11.) Plaintiff alleges that his injuries were caused by Defendants' intentional negligence and deliberate indifference to Plaintiff's health and safety. (Id. at 10.)

Plaintiff alleges that Defendants were aware of all the misconduct, crimes, illegal drug activity, and safety violations that were being committed by the inmate fire crews, California Fire Staff, and CDCR correctional officials. (Id. at 10-19.) Plaintiff refers to a prior fire emergency that occurred before August 25, 2024 in Konocti, California that Plaintiff alleges Defendants had prior knowledge of. (Id.) At the Konocti fire emergency, Plaintiff alleges that Captain Lunt, Captain Nunez, and Officer Golden were present while inmate firefighters allegedly burglarized homes and an inmate firefighter allegedly overdosed from fentanyl that was stolen from a resident's home. (Id. at 12, 17, 19.) Plaintiff alleges that Defendants compromised the whole fire emergency mission by condoning all the misconduct and allowing the inmates to continue to work on the fire and remain on the crew, despite having knowledge of the unsafe work violations occurring. (Id. at 11.) Plaintiff also alleges that Officer Hernandez on multiple occasions turned a blind eye and kept

giving free passes to the inmate fire crews by allowing them to keep serious contraband, such as drugs and cellphones, to motivate them to keep working while they were on fire emergencies. (Id.)

Plaintiff alleges that he personally reported all his complaints to Sergeant Lanthrip, Lieutenant Sloat, Captain Lunt, and Captain Nunez regarding the misconduct he had witnessed among the inmate fire crews within the camp, the misconduct by California Fire staff, CDCR correctional officers, and his injuries from August 25, 2024. (Id. at 12-19.) Plaintiff alleges that Sergeant Lanthripp downplayed and ignored all of the serious misconduct that Plaintiff brought to his attention and refused to transfer Plaintiff to another fire camp or remove him from harm's way. (Id. at 12.) Plaintiff alleges that Sergeant Lanthripp threatened him with retaliation if he did not stop complaining or if he filed a 602 grievance to report any of the incidents or fire camp conditions that he witnessed. (Id. at 12-13.) In one interaction, Plaintiff alleges that Sergeant Lanthripp said "he has certain inmates on the fire crews that report back to him everything that goes on within the camp including if there is a 'snitch.'" (Id. at 13.) Plaintiff alleges that Sergeant Lanthripp further told him that he would be watching Plaintiff closely and would inform all the other officers at the camp to keep a close eye on him. (Id.) Plaintiff alleges that the August 25, 2024 incident occurred the very next day after this interaction. (Id.)

Plaintiff alleges that after the incident, he went to Sergeant Lanthripp to report his injuries, requested a medical transfer, and sought medical attention, but Sergeant Lanthripp scolded him and accused him of trying to abandon an active fire emergency by using a false pretense of minor or fake medical issues. (Id.) Plaintiff alleges that he insisted on being transferred to another camp because he was afraid of more future injuries occurring or even being killed due to the intentional negligence happening on the worksite. (Id.) Plaintiff alleges that Sergeant Lanthripp denied Plaintiff's transfer request and threatened to make things hard for Plaintiff, including taking away Plaintiff's fire camp program and making sure that Plaintiff is sent to a

prison with harsh conditions. (Id. at 14.) Plaintiff alleges that Sergeant Lanthripp continued to warn Plaintiff that he should think about his decisions and all the people who would be angry with him "because [Plaintiff] couldn't keep his fuckin mouth shut." (Id.) Plaintiff alleges that Sergeant Lanthripp said that he and the other officers would be "pissed" if they missed out on overtime fire pay. (Id.)

Plaintiff alleges that he asked Lieutenant Sloat to be sent to SCC for medical attention and transferred to a nearby Fire Camp due to Plaintiff's concerns for his safety and wellbeing. (Id. at 16.) Plaintiff alleges telling Lieutenant Sloat of his interaction with Sergeant Lanthripp where he felt unsafe due to being intimidated with violence for being "a snitch." (Id.) Plaintiff alleges that even with this knowledge, Lieutenant Sloat neglected to perform his duty as the overall commanding officer at the camp and uphold public safety laws to keep Plaintiff and other inmate fire crew members safe. (Id. at 16-17.)

Plaintiff alleged that Captain Lunt responded to his concerns by stating Plaintiff "should blame CDCR for sending him a bunch of drug addicts to work for him." (Id. at 17.) Plaintiff alleges that after he informed Captain Lunt of his injuries from the August 25, 2024 incident, Captain Lunt stated he could patch Plaintiff up and that he should keep working even though he requested medical attention. (Id. at 17-18.) Plaintiff alleges that when he continued to complain to Captain Lunt about his condition, Captain Lunt threatened him with disciplinary write-ups and the possibility of Plaintiff's firefighter eligibility being taken away. (Id. at 18.)

Plaintiff alleges that Captain Nunez responded by acknowledging that 95% of the inmate fire crew members are drug addicts, but that his hands were tied. (Id. at 19.) Plaintiff alleges that Captain Nunez stated to him that he had personally reported the matter of drug abuse to CDCR officials and his California Fire higher ups, so the matter was bigger than what he could handle. (Id.)

Overall, Plaintiff alleges that Defendants disregarded misconduct and continued the progression of work with the inmate fire crews as if these violations

had never occurred. (Id.) As such, Plaintiff believes that Defendants' deliberate indifference to his health and safety violated his Eighth Amendment rights. (Id. at 10-19.)

According to Plaintiff, after he returned to Oak Glen Fire Camp when the August 25, 2024 fire emergency was over, he filed written 602 grievance reports against Defendants and everything that Plaintiff had witnessed within the past week. (Id. at 14.) Since then, Plaintiff alleges that he has been subjected to retaliation, intimidation, sexual abuse and harassment, and falsified reports with disciplinary actions made against him by the majority of the officers at the camp. (Id.)

Plaintiff's second set of allegations centers around alleged violations of Plaintiff's Eighth and Fourth Amendment rights by Correctional Officers Ulloa and Haught. Plaintiff alleges that each correctional officer sexually assaulted him during unauthorized searches. (Id. at 6.) Plaintiff alleges that on August 23, 2024, Officer Ulloa ordered Plaintiff to submit to a body search, which Plaintiff believed to be an unauthorized search to obtain sexual gratification. (Id. at 7.) Plaintiff alleges that Officer Ulloa asked if Plaintiff was concealing any contraband because Officer Ulloa said "he noticed a big bulge in [Plaintiff's] lower waste near [his] private area." (Id.) Plaintiff denied concealing any contraband and offered to strip out of his clothes for a usual strip search to prove that he was not hiding anything. (Id.) Plaintiff alleges that Officer Ulloa said that was not necessary and "walk[ed] towards [Plaintiff] and reach[ed] his hands inside the front of [Plaintiff's] pants then grab[bed] and squeeze[d] [his] penis." (Id.) Plaintiff alleges that when he protested, Officer Ulloa told him to relax and that what he had done was the proper and usual procedure at the camp. (Id.)

Plaintiff alleges that on October 7, 2024, Plaintiff and other inmate firefighters returned to camp and had their lunch boxes and property searched. (Id. at 8.) Plaintiff alleges that Officer Ulloa picked Plaintiff out and instructed Plaintiff to follow him to the camp dining building, which was away from the other officers and

inmates. (Id.) Plaintiff alleges that Officer Ulloa instructed Plaintiff to spread his legs and stand in position so that he could conduct a pat down search. (Id.) Due to Plaintiff's prior experience with Officer Ulloa, Plaintiff was uncomfortable and allegedly tried to reject Officer Ulloa's orders and offered to conduct a strip search himself so Officer Ulloa would not have any reason to touch Plaintiff. (Id.) Plaintiff alleged that Officer Ulloa responded by shouting, "Shut up you black piece of shit" along with other threats. (Id.) Plaintiff alleges that Officer Ulloa then "pat[ted] [Plaintiff] down aggressively by starting from [his] legs and then worked his way up to [Plaintiff's] private area and then he stated 'there goes that bulge again' and then grabbed and pulled at [Plaintiff's] penis through his nomex work pants, which caused [Plaintiff] physical pain and discomfort . . . ." (Id.)

Plaintiff's allegations against Officer Haught centers around a similar unauthorized body search, which Plaintiff alleges was done to retaliate, intimidate, and obtain sexual gratification. (Id. at 20.) On October 29, 2024, Plaintiff alleges that he was working out at the camp gym when Officer Haught ordered him to stand up and starting using foul language towards him, calling him an "ungrateful son of a bitch" and a slur. (Id.) Plaintiff alleges that he had missed breakfast, and Officer Haught thereafter accused him of hiding something and ordered Plaintiff to submit to a pat down search. (Id.) Plaintiff alleges that he declined and requested for another officer to do it due to prior uncomfortable experiences with Officer Haught. (Id.) Plaintiff stated that Officer Haught then walked towards him and "reache[d] around [Plaintiff] with both of his hands grab[bed] and squeeze[d] [Plaintiff] by [his] buttocks area and then ma[de] his way towards [Plaintiff's] beltline and then felt around [Plaintiff's] private area, and then started to grab and pull at [Plaintiff's] penis through his pants, causing [Plaintiff] pain and discomfort." (Id. at 21.) Plaintiff alleges that when he tried to resist, Officer Haught shouted, "don't move, don't move" and stated to Plaintiff that this was in retaliation for reporting his co-worker's misconduct. (Id.)

Plaintiff alleges that Officer Haught stated that if he doesn't like being harassed like this then he should stop harassing his fellow officers with "bullshit complaints and filed reports." (Id.) Plaintiff alleges that Officer Haught stated this type of treatment would continue or get worse if Plaintiff continued to file complaints. (Id.) Plaintiff alleges Officer Haught further stated "that he knows [Plaintiff] likes to be felt up" according to what Officer Ulloa told him. (Id.) Plaintiff alleges that Officer Haught concluded by saying that if he received any future complaints from officers or staff at the camp about Plaintiff filing new 602 grievances or complaints against them, then he would come back to see Plaintiff. (Id.) Plaintiff alleges that when he expressed to Officer Haught that he would report this to his supervisors and file a PREA complaint, Officer Haught stated "do it and see what happens." (Id.) Plaintiff therefore believes that Officer Haught conspired with the other defendants to retaliate and use different forms of intimidation to dissuade Plaintiff from reporting any misconduct that occurred or that Plaintiff may have witnessed at the camp. (Id. at 22.) Overall, Plaintiff alleges that Officer Ulloa and Officer Haught violated his Fourth and Eighth Amendment rights by "utilizing an unauthorized search in order to obtain sexual gratification." (Id. at 7.)

Plaintiff's third set of allegations centers around retaliation in violation of the First Amendment and a violation of his due process rights under the Fourteenth Amendment. Plaintiff brought this claim against Correctional Officers Ulloa and Haught, Sergeant Lanthripp, Lieutenant Sloat, and Officer Golden for interfering with Plaintiff's administrative grievance and remedy process "by using intimidation, retaliation, threats, and falsifying reports and disciplinary documents against Plaintiff to pressure him to drop complaints and misconduct that Plaintiff had made against them and other officers at the camp." (Id. at 23.)

Plaintiff alleges that on October 7, 2024, Officer Ulloa falsified an RVR/Report stating that he caught Plaintiff in possession of a cellular phone. (Id.) Plaintiff alleges that on October 29, 2024, Officer Haught falsified an RVR/Report

stating that he had caught Plaintiff in possession of a cellular phone. (Id. at 24.) Plaintiff alleges that these falsified RVRs were done in retaliation to cover up Plaintiff's complaints of misconduct against Officer Ulloa, Officer Haught, and the other correctional officers at the camp. Plaintiff explains that this occurred within the same timeframe of Officer Ulloa's alleged sexual assault and the same day as Officer Haught's alleged sexual assault and intimidation. (Id. at 23-24.) Plaintiff further alleges that on November 23, 2024, Officer Golden falsified an RVR/write up against him in retaliation of his 602/grievance complaints against Officer Golden and to intimidate him. (Id. at 27.) Plaintiff alleges that the falsified report stated Officer Golden caught Plaintiff in possession of a cellular phone. (Id.) Plaintiff also alleges that, on several occasions, Officer Golden threatened Plaintiff to do whatever it takes to sabotage his firefighter program privileges if he did not comply with his commands. (Id. at 28.) As a result, Plaintiff alleges that Officer Ulloa, Officer Haught, and Officer Golden violated his First Amendment right by interfering with his administrative grievance and complaint remedy process. (Id. at 23-28.)

Plaintiff alleges that he personally went to Sergeant Lanthripp to report Officers Haught and Ulloa for sexual assault. (Id. at 25.) Plaintiff alleges Sergeant Lanthripp tried to use intimidation tactics to get him to drop his sexual abuse claims by threatening to call a psychiatric doctor to evaluate Plaintiff's mental health. (Id.) Plaintiff also alleges that Sergeant Lanthripp stated that he would charge Plaintiff with a violation for bringing these allegations against his officers, remove him from the entire Fire Camp program, and send Plaintiff to a prison with very harsh conditions. (Id.) Plaintiff alleges that Sergeant Lanthripp then brought out all of his written Administrative 602/grievance complaints, read each of them out loud, and ripped them up in front of Plaintiff stating "he has personally resolved the issues." (Id.) Plaintiff alleges Sergeant Lanthripp then ordered Plaintiff to leave his office immediately while reminding Plaintiff what happened to the other inmate who had made sexual assault allegations against one of his officers. (Id.) Plaintiff alleges that

Sergeant Lanthripp conspired with other officers and certain inmates to intimidate and retaliate against anyone who came forward with complaints, thereby violating his First and Fourteenth Amendment rights by obstructing and interfering with his administrative grievance and remedy process. (Id. at 25-26.)

Plaintiff alleges that he personally went to Lieutenant Sloat to report the sexual assault he experienced from Officers Ulloa and Haught, the falsified reports and write-ups made against him, and Sergeant Lanthripp ripping up Plaintiff's 602/grievance complaints. (Id. at 26.) Plaintiff alleges that he asked Lieutenant Sloat for help and requested to be transferred to another fire camp, but Lieutenant Sloat declined his request stating that he already had this discussion with Sergeant Lanthripp. (Id.) Plaintiff alleges that Lieutenant Sloat backed Sergeant Lanthripp's actions by stating that a supervising officer has the right to resolve a grievance or any complaint by an inmate in house. (Id.) Plaintiff alleges that Lieutenant Sloat further stated that he had worked with Sergeant Lanthripp for years and "[Lanthripp] does not make threats." (Id.) Plaintiff alleges that Lieutenant Sloat pointed to a stack of papers on his desk of multiple write-ups for several inmates who are in violation of serious misconduct and told him that "if he has to get rid of everyone then he wouldn't have a camp to run." (Id. at 27.) Plaintiff alleges that Lieutenant Sloat obstructed and interfered with his administrative grievance and remedy process, thereby violating his First and Fourteenth Amendment rights. (Id.)

Based on these allegations, Plaintiff asserts four claims for relief under 42 U.S.C. § 1983 for: (1) sexual assault and unreasonable search in violation of the Fourth and Eighth Amendments against Defendants Ulloa and Haught (Claim One); (2) deliberate indifference to health and safety in violation of the Eighth Amendment against Defendants Hernandez, Golden, Lanthripp, Sloat, Lunt, and Nunez (Claim Two); (3) retaliation in violation of the First Amendment against Defendants Ulloa, Haught, Golden, Lanthripp, and Sloat (Claim Three); (4) interference with administrative grievance and remedy process in violation of due process under the

Fourteenth Amendment against Defendants Ulloa, Haught, Golden, Lanthripp, and Sloat (Claim Four). (Id. at 4-28.)

**III.**

**SCREENING REQUIREMENT**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b); see also Byrd v. Phoenix Police Dep't, 885 F.3d 639, 641-42 (9th Cir. 2018).

Moreover, when a plaintiff appears *pro se* in a civil rights case, the Court must construe the pleadings liberally and afford the plaintiff the benefit of any doubt. See Byrd, 885 F.3d at 642; Hoffman v. Preston, 26 F.4th 1059, 1063 (9th Cir. 2022) ("We construe pro se complaints liberally and afford the petitioner the benefit of any doubt."). In giving liberal interpretation to a *pro se* complaint, the Court may not, however, supply essential elements of a claim that were not initially pled. See Litmon v. Harris, 768 F.3d 1237, 1241 (9th Cir. 2014). The Court must give a *pro se* litigant leave to amend the complaint unless it is "absolutely clear that the deficiencies of the complaint could not be cured by amendment." Akhtar v. Mesa, 698 F.3d 1202, 1212 (9th Cir. 2012) (internal quotation marks omitted).

For the reasons discussed below, the Court finds that Plaintiff has sufficiently alleged Claims One through Three at the screening stage, but has failed to state a plausible claim for relief as to Claim Four. However, Plaintiff will be granted leave to amend Claim Four. The Court further concludes that Plaintiff has failed to state a claim against any of the defendants in their official capacities.

## IV.

## DISCUSSION

### A. <u>The Eleventh Amendment Bars Plaintiff's Official-Capacity Claims Against Defendants.</u>

In the Complaint, Plaintiff specifies that Defendants are sued in their individual or official capacities and acted "under color of law." (Dkt. 1 at 3-6) However, the Eleventh Amendment generally bars suits in federal court seeking monetary damages against a state or state officials acting in their official capacities because such claims are treated as suits against the State itself. <u>See</u> <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989); <u>Simmons v. Sacramento Cnty. Superior Court</u>, 318 F.3d 1156, 1161 (9th Cir. 2003) (suit against state court and its employees barred by Eleventh Amendment). Because the State and its agencies are not "persons" subject to damages liability under 42 U.S.C. § 1983, and because the Eleventh Amendment generally bars suits for damages against the State absent waiver or valid congressional abrogation, Plaintiff cannot recover monetary damages from Defendants in their official capacities. Accordingly, Plaintiff's official-capacity claims for damages must be dismissed. Plaintiff may proceed against Defendants only in their individual capacities for damages.

### B. <u>Plaintiff Fails To State A Fourteenth Amendment Due Process Claim.</u>

Plaintiff alleges that Defendants Ulloa, Haught, and Golden issued false Rules Violation Reports ("RVRs") in retaliation for Plaintiff's complaints regarding alleged staff misconduct and sexual abuse. (Dkt. 1 at 23-24, 27.) Plaintiff further alleges that Sergeant Lanthripp and Lieutenant Sloat condoned or relied upon the allegedly false reports and interfered with Plaintiff's efforts to challenge them through the prison grievance process. (<u>Id.</u> at 25-26.) Plaintiff contends that these actions violated his right to due process under the Fourteenth Amendment. (<u>Id.</u> at 23.)

The Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its

protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Inmates, like other persons, generally may not be deprived of life, liberty, or property without due process law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). "The range of liberty interests protected by the procedural due process requirement is not 'infinite,' and procedural due process guarantees apply only when a constitutionally protected liberty interest is at stake." King v. Jauregui, 2019 WL 6312574, at *3 (C.D. Cal. Oct. 4, 2019) (citing Ingraham v. Wright, 430 U.S. 651, 672-73 (1977)). Liberty interests can arise from the Constitution itself, or from an expectation or interest created by state law or policies. Wilkinson, 545 U.S. at 221; Sandin v. Conner, 515 U.S. 472, 483-84 (1995). Liberty interests created by state law are generally limited to the freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483-84.

If a deprivation creates an "atypical and significant hardship," then the Court must determine whether the procedures used satisfied due process. See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003). Pursuant to the Supreme Court's decision in Wolff, prison disciplinary actions must comply with the following procedural requirements: "(1) written notice of the charges; (2) a hearing, with at least 24-hours advance notice; (3) a written statement by the fact finders of the evidence relied on and the reasons for taking disciplinary action; (4) the prisoner's right to call witnesses in his or her defense, if doing so would not be unduly hazardous to institutional safety or correctional goals; and (5) legal assistance to prisoners who are illiterate or whose issues are particularly complex." Tinsley v. Fox, 2016 WL 6582588, at *11 (E.D. Cal. Nov. 7, 2016) (citing Wolff, 418 U.S. at 556-71). Additionally, the decision must be supported by "some evidence" in the record with "some indicia of reliability." Superintendent v. Hill, 472 U.S. 445, 455-56 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987). Therefore, if there is any evidence in the record that supports the challenged decision, it is not arbitrary and comports with due

process. Superintendent, 472 U.S. at 457.

Here, Plaintiff has not alleged facts demonstrating that the challenged RVRs implicated a protected liberty interest. Indeed, the Complaint does not allege what the outcome of the RVRs were. For instance, Plaintiff does not mention whether the RVRs proceeded to a hearing, whether the Plaintiff was found guilty, or what the consequences were, if any, as a result of the RVRs. As a result, the factual basis of Plaintiff's alleged Fourteenth Amendment violation is unclear. To the extent Plaintiff bases his Fourteenth Amendment claim on a procedural due process violation arising from the administrative process that occurred as a result of the RVRs, Plaintiff's claim fails because he has not alleged facts establishing that he had a liberty interest to remain free from restraint or that the false RVRs "impose[d] atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life." See Sandin, 515 U.S. at 483-84. Without allegations establishing the existence of a protected liberty interest, Plaintiff cannot state a procedural due process claim.

Further, the Complaint also fails to allege facts demonstrating that Plaintiff was denied the procedural protections required by Wolff. Plaintiff does not allege that he was denied written notice of the charges, denied a hearing, denied a written statement of the evidence relied upon, denied the opportunity to call witnesses, or denied assistance to which he may have been entitled. See Wolff, 418 U.S. at 556-71). Plaintiff also fails to allege that any resulting disciplinary finding from the RVRs lacked "some evidence" in the record. See Superintendent, 472 U.S. at 455-57. The allegation that the RVRs were falsified also does not itself establish that a due process violation occurred, so long as Plaintiff was given the necessary process to contest them. See Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) ("Sprouse's claims based on the falsity of the charges and the impropriety of Babcock's involvement in the grievance procedure, standing alone, do not state constitutional claims."); see also Freeman v. Rideout, 808 F.2d 949, 951-52 (2d Cir.

1986) (holding that allegation of false evidence being planted by prison guard does not state constitutional claim where procedural due process protections are provided). As such, the due process claim should be dismissed due to a lack of factual and constitutional basis. However, Plaintiff's First Amendment retaliation claim based on these factual allegations may proceed. See Sprouse, 870 F.2d at 452 ("That the Constitution does not obligate the state to establish a grievance procedure is, we believe, of no consequence here, since what is at stake is a prisoner's right of access to an existing grievance procedure without fear of being subjected to a retaliatory disciplinary action."). If such retaliatory actions were allowed, then the "purpose of the grievance procedure—to provide an administrative form for the airing of prisoner complaints—would be defeated." (Id.)

Overall, the allegations in the Complaint are insufficient to state a viable claim for violations of Plaintiff's due process rights under the Fourteenth Amendment. If Plaintiff wants to try and state a claim for due process violations under the Fourteenth Amendment, he should include additional facts to clearly describe what deprivation of liberty he is asserting, how that deprivation created an "atypical and significant hardship" for him, and which procedural requirements under Wolff Defendants failed to comply with, if any.

**C. Plaintiff Fails to State a Claim Against Defendants Based on the Prison Grievance Process.**

To the extent Plaintiff also bases his due process claim on Defendant's alleged mishandling or denial of his inmate grievances, those allegations likewise fail to state a constitutional claim. Inmates do not possess a freestanding constitutional right to a specific prison or jail grievance procedure and no constitutional entitlement to a particular outcome during the grievance review process. See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003) ("[I]nmates lack a separate constitutional entitlement to a specific prison grievance procedure."); Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure.").

Thus, a prison official's denial or rejection of a grievance, failing to investigate, or allegedly covering up misconduct does not itself violate the constitution. See Evans v. Skolnik, 637 Fed. App'x 285, 288 (9th Cir. 2015).

Accordingly, allegations that a grievance system is ineffective, inconvenient, restrictive, or poorly designed generally do not, standing alone, establish a constitutional violation actionable under Section 1983. Plaintiff does not allege that Defendants entirely prohibited inmates from submitting grievances or that Plaintiff was denied all access to the grievance process. The Complaint reflects that Plaintiff was able to submit multiple 602 grievances and to raise his complaints directly with Defendants. (Dkt. 1 at 12-14, 16-17, 19, 25.) Plaintiff simply alleges that his grievances were disregarded, dismissed, or destroyed once submitted. (Id. at 23-28.) Because inmates have no constitutional entitlement to having a grievance investigated, credited, or resolved in a particular way, these allegations are insufficient to state a claim as a matter of law.

## V.

## ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Complaint is DISMISSED WITH LEAVE TO AMEND. Specifically, Claim Four of the Complaint is dismissed with leave to amend. Additionally, all of Plaintiff's claims against Defendants in their official capacities are dismissed. Plaintiff is granted leave to file an amended complaint to attempt to cure the deficiencies noted above if wants to attempt to state a viable claim against Defendants in their official capacities or attempt to correct the deficiencies related to Claim Four. However, Plaintiff may also elect to proceed only on Claims One through Three and against Defendants in their individual capacities instead of filing an amended complaint. Therefore, if Plaintiff wants to voluntarily dismiss Claim Four, voluntarily dismiss the claims against Defendants in their official capacities, and then proceed on Claims

One through Three in the Complaint against all Defendants in their individual capacities only, he can file a Notice of Voluntary Dismissal indicating that this is how he wants to proceed. A form Notice of Dismissal is attached for Plaintiff's convenience.

If Plaintiff wants to attempt to correct the deficiencies in Claim Four and/or attempt to state a viable claim against Defendants in their official capacities, then he may file a First Amended Complaint ("FAC") no later than **August 31, 2026**. If Plaintiff chooses to file a FAC, it should bear the docket number assigned to this case (5:26-cv-02689-MRA-AJR), be labeled "First Amended Complaint," and be complete in itself without any reference to other document such as the Complaint (except for any exhibit to the FAC). This means that the FAC would have to repeat the prior Claims One through Three, and then include revised Claim Four that corrects the deficiencies identified above. **Plaintiff is encouraged to state any amended claims in simple language and provide only a brief statement of supporting facts, omitting facts that are not relevant. Should Plaintiff decide to file a FAC, he is encouraged to utilize the form complaint attached to this Order.**

\\

\\

\\

\\

\\

**Plaintiff is explicitly cautioned that failure to timely file either a Notice of Dismissal of Claim Four and the official-capacity claims, or an FAC that attempts to correct the deficiencies described above will result in a recommendation that this action be dismissed with or without prejudice for failure to prosecute and obey court orders pursuant to Federal Rule of Civil Procedure 41(b).**

IT IS SO ORDERED.

DATED: August 3, 2026

HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE

Attachments:
CV-09, Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c).
CV-66, United States District Court, Central District of California Civil Rights Complaint.